### IN RE SCROGHAM
### ASSOCIATED SEED GROWERS, INC. v. SCROGHAM

(No. 2048; November 10, 1937; 72 Pac. (2d) 200)

For the appellant there was a brief and oral argument by *Ernest J. Goppert* of Cody, Wyoming.

For the respondent, there was a brief by *Milward L. Simpson* and *Meyer Rankin* of Cody, and an oral argument by *Mr. Simpson.*

RINER, Justice.

This cause, brought here by direct appeal, arises under the Workmen's Compensation Law of this state. The district court of Park County made an award in favor of the respondent, Clarence Scrogham, hereinafter usually referred to as the "employee" or "claimant," and the appellant, Associated Seed Growers, Inc., a corporation, subsequently designated herein as the "employer" or the "company," claiming error in the court's action in that respect, asks that the record be reviewed.

The material facts are very little in dispute and would appear to be these: Scrogham, a married man, with three children, aged one, three and five years respectively, in his family, living at Powell, Wyoming, went to work for the Company in its seed plant there the latter part of June, 1935. He testified that he had never experienced any illness since he was nine years old. In 1930 he took out a life insurance policy, carried it for several years and then dropped it. He was employed by the Company from about the middle of August, 1935, until January 8, 1936, to draw off seed beans from a hopper into sacks, then to lift and pile these sacks on a five bag truck, the top sack being placed at a height of from three and one-half to four feet. When there were scales under the hopper, which sometimes was the case, the sacks were filled to weigh

112 to 120 pounds; if there were no scales, the sacks would weigh on an average from 125 to 130 pounds; also some of the larger sacks would then be filled to weigh 150 pounds. He handled from 20 to 30 sacks of beans an hour. The employee worked eight hours a day on two shifts, working some weeks on one shift, some on another. One of these shifts was from 6 A. M. to 2 P. M., and the other from 2 P. M. to 10 P. M.

On December 27, 1935, when Scrogham was working on the afternoon shift, which as already indicated ran until 10 o'clock at night, and just after he had eaten his evening meal, about six o'clock, what took place is thus described by the claimant's testimony:

"I was draining off the hopper. I bent over to pick up a sack and put it five high. That was the fifth sack up. When I looked at the light bulb there was red streaks of stuff through my left eye. I told some of the boys working there I could see different objects, and they all looked red to me when I looked at the light. When I didn't look at the light it looked like a bunch of moss wove around through my eye."

One of his fellow workmen, as a witness, testified about hearing Scrogham make the remark about seeing objects "red," referred to in the claimant's testimony. On cross-examination and redirect examination claimant further said that he noticed something in front of his eye, a "cloudiness," and seeing "red" for the first time on the date last mentioned after he stooped to lift one of the sacks and "went to straighten up." Previous to this time the only trouble he had had with his eyes was their "watering" and a "flickering" or "twitching" sensation. Having occasion, the early part of December, 1935, to take one of his children to a licensed optometrist, on account of an inflamed eye, he had the practitioner examine claimant's own eyes, and was then told that there was nothing wrong with them.

After the occurrence, on December 27, 1935, Scrog-

ham told the manager of the Seed Plant about the condition of his left eye, as he had mentioned it to his fellow workmen, and was directed by the manager to go to Billings, Montana, to consult an eye specialist in that city. The latter made an examination of both eyes of the employee on December 30, 1935, finding therefrom that Scrogham had rather an extensive recent hemorrhage on the interior of his left eye and that his vision was in that eye reduced to see from only three to five feet. The right eye was, however, at the time found to be nearly normal, the specialist testifying on the trial of this case that then in that eye "with very weak lenses he had normal vision." After this examination the employee returned to Powell and continued his work as usual in the Company's seed plant for about a week longer. On January 9, 1936, Scrogham returned to the specialist complaining of something in his right eye. A second examination was then made and it disclosed that he had suffered a hemorrhage in that eye also. Shortly thereafter, at the direction of the employer, following the eye specialist's suggestion, the employee returned to Billings and was subjected to a thorough physical examination by other physicians. This examniation, by an X-ray of the lungs, disclosed "an old healed tuberculosis." Scrogham was re-examined by several eye specialists on February 10, 1936, and the condition of both his eyes was at that time found to be bad. It appears that his loss of eyesight grew progressively worse.

Medical testimony was forthcoming at the trial, given by the eye specialist and other doctors, that the walls of the blood vessels in claimant's eyes had been weakened by the old tuberculosis without his knowledge; that the employee was totally and permanently disabled in both of his eyes so far as his sight was concerned; that a strain would produce these hemorrhages in the eye, as also would the effect of lifting, scuffling

with other employees, walking hard, jarring the body through jumping from a platform, or even the excitement of becoming angry; that the strain of lifting the bean sacks in the workman's employment would be such as would cause these hemorrhages; that if there were no strain, but there was an old tubercular condition of the lungs, showing that it had healed at some remote time, that of itself would not cause the eye hemorrhage; that a person suffering from weakened blood vessels in the eye as a consequence of an old healed tuberculosis might safely go through life without any impairment of vision if he were very careful in all physical movements; that a person of Scrogham's age, with normal blood vessels in his eyes, would not be affected by hard labor or the strain of lifting the bean sacks, and that the weakening of the walls of the blood vessels of the eye is an unusual development of the disease of tuberculosis. There would seem to be no definite evidence in the record regarding the time when Scrogham first noticed hemorrhages in his right eye.

All the medical testimony agreed that a person would notice the hemorrhage within a few seconds after it occurred, as when it first takes place "the light of any light appears red."

Other items of testimony in the record will be mentioned as will be necessary to fully understand the questions presented and their disposition herein.

The district court found among other facts that "the hemorrhage and rupture of the blood vessels sustained by the workman Scrogham occurred while he was working for the Associated Seed Growers, Inc., in the regular course of his employment," and concluded "that the straining in lifting of the sacks of beans, during the regular employment of the petitioner by the employer, and the bursting of the blood vessels of his eyes from the continuous straining while lifting the sacks of beans is an accident under the Wyoming Com-

pensation Law, and is compensable under said Law." An award was given for permanent total blindness in both eyes.

The employer contends that there was not sufficient evidence to sustain any finding that claimant suffered an accidental injury on December 27, 1935, as a result of his employment, but that his blindness was caused by disease not ensuing from an injury suffered in that employment. It is also urged that the employee was merely doing his usual work when the difficulty with his eye occurred on the date mentioned.

In aid of our solution of these questions which have frequently arisen elsewhere, we are confronted with a wealth of material in the form of adjudicated cases touching them, which are not always harmonious, even under statutory provisions quite like our own. To analyze and differentiate them would easily require a volume in itself. We prefer to announce our conclusions after reviewing a comparatively few of the decisions in jurisdictions having statutes either worded similarly or given like legal effect with our own, and whose courts of high authority, through broad experience and with a liberal view of this type of statutory law, have advanced reasoning which appeals to us as sound.

Section 124-106-7 of Wyoming Revised Statutes, 1931, as amended and re-enacted by Section 2 of Chapter 100, Laws of Wyoming, 1935, provides in the pertinent part of subdivision "(1)" thereof:

"The words 'injuries sustained in extra-hazardous employment,' as used in this chapter, shall include * * * injuries to employes, as a result of their employment and while at work in or about the premises occupied, used or controlled by the employer."

Subdivision "(m)" of said Section 2 provides also:

"The words 'injury and personal injury' shall not

include * * * a disease, except as it shall directly result from an injury incurred in the employment."

In Pero v. Collier-Latimer, Inc., 49 Wyo. 131, 52 Pac. (2d) 690, we held that the personal injury for which compensation could be allowed under the Workmen's Compensation Law of this state is one arising through accident. Our Workmen's Compensation law, through the use of the word "accident" as describing injuries regarded as compensable in its provisions relating to the administration thereof, is somewhat akin to the New Hampshire law. The court of last resort in that state has construed their law in this respect similarly as was done in the Pero case. See Guay v. Brown Company, 83 N. H. 392, 142 Atl. 697, 60 A. L. R. 1284.

As heretofore indicated in the opinion filed in the Pero case, supra, the English Workmen's Compensation Law is analogous to our own in that it also provides that in any employment affected by the act, when "personal injury by accident arising out of and in the course of the employment is caused to a workman," the injury shall be compensable.

In the leading case of Clover, Clayton & Company, Ltd. v. Hughes (1910) A. C. 242; 3 B. W. C. C. 275, there were two questions for decision, viz., whether the workman had suffered an accidental personal injury, and whether the injury arose out of the employment. The facts were not complex. While the workman was engaged in tightening a nut with a spanner or wrench and pressing down on the tool, his left foot slipped forward and he fell backwards. He tried to recover himself, made an exclamation, fell on his back striking his head, and was found to be dead. Postmortem examination revealed that he had a large aneurism of the aorta, so advanced in condition that the trial court found it might have burst while the man was asleep and that a very slight exertion or strain would have been ample to cause its rupture. That court

also found that the evidence was insufficient to hold that the workman had slipped; that the strain put upon the employee by the exertion of tightening the nut with the wrench caused the rupture from which the workman died; and that there was no evidence from which an exact conclusion could be drawn concerning the extent of this strain, but it was at all events, not more than ordinary in such work. The occurrence was held to be a personal injury caused by accident arising out of the employment and compensable. On appeal by the employers to the House of Lords this decision was affirmed, two of the judges dissenting.

Referring to the often quoted and often approved definition of an "accident" as given in Lord Macnaghten's judgment in Fenton v. Thorley, 1903) A. C. 443, that it was "an unlooked for mishap or an untoward event, which is not expected or designed," Lord Chancellor Loreburn's clear and forceful reasoning upon the first question involved was as follows:

"The first question here is whether or not the learned Judge was entitled to regard the rupture as an 'accident' within the meaning of this Act. In my opinion he was so entitled. Certainly it was an 'untoward event.' It was not designed. It was unexpected in what seems to me the relevant sense, namely, that a sensible man who knew the nature of the work would not have expected it. I cannot agree with the argument presented to your Lordships that you are to ask whether a doctor acquainted with the man's condition would have expected it. Were that the right view then it would not be an accident if a man very liable to fainting fits fell in a faint from a ladder and hurt himself. No doubt the ordinary accident is associated with something external; the bursting of a boiler, or an explosion in a mine, for example. But it may be merely from the man's own miscalculation, such as tripping and falling. Or it may be due both to internal and external conditions, as if a seaman were to faint in the rigging and tumble into the sea. I think it may also be some-

thing going wrong within the human frame itself, such as the straining of a muscle, or the breaking of a blood vessel. If that occurred when he was lifting a weight it would be properly described as an accident. So, I think, rupturing an aneurism when tightening a nut with a spanner may be regarded as an accident. It cannot be disputed that the fatal injury was in this case due to this accident, the rupture of the aneurism."

His views as to the second question were these:

"When the man's condition was such that he might have died in his sleep, and the mere tightening the nut with no more strain than ordinary in such work caused the accident, can it be said that the accident was one 'arising out of' the employment? That seems to me to be the crucial point.

"I do not think we should attach any importance to the fact that there was no strain or exertion out of the ordinary. It is found by the County Court Judge that the strain in fact caused the rupture, meaning, no doubt, that if it had not been for the strain, the rupture would not have occurred when it did. If the degree of exertion beyond what is usual had to be considered in these cases, there must be some standard of exertion, varying in every trade. Nor do I think we should attach any importance to the fact that this man's health was as described. If the state of his health had to be considered, there must be some standard of health, varying, I suppose, with men of different ages. An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of health.

"It may be said, and was said, that if the Act admits of a claim in the present case, every one whose disease kills him while he is at work will be entitled to compensation. I do not think so, and for this reason. It may be that the work has not, as a matter of substance, contributed to the accident, though in fact the accident happened while he was working. In each case the arbitrator ought to consider whether in substance, as far as he can judge on such a matter, the accident came from the disease alone, so that whatever the man had been doing it would probably have come all the

same, or whether the employment contributed to it. In other words, did he die from the disease alone or from the disease and employment taken together, looking at it broadly? Looking at it broadly, I say, and free from over nice conjectures: Was it the disease that did it or did the work he was doing help in any material degree?"

A workman fifty years old, employed in respondent's tin sheds for some ten years to move tin plates in cases, was engaged with other men in shifting heavy cases. In the afternoon of that day, while they were moving lighter cases than those first handled, he fell backwards and died almost immediately. In this instance, also, it was found that death ensued from rupture of an aneurism of the aorta. The trial judge held that there had been no accident, but the English Court of Appeal, in 1915, in McArdle v. Swansea Harbour Trust, 85 L. J. K. B. 833, 8 B. W. C. C. 489, held that he was mistaken in this conclusion and that as soon as it was determined that the rupture occurred by reason of the strain at work, however slight that strain might have been, an accident was proven within the purview of the Workmen's Compensation Law.

Again, a laborer suffering from disease of the coronary arteries, whose condition was such that he might die of heart failure at any moment, whether working or not, was employed as a dipper in a galvanizing department. He was engaged in the laborious work of cleaning out the dross. One day, the operation being finished, he sat down and died within ten minutes. The cause of death as shown by the post-mortem examination was angina pectoris. There was medical evidence to the effect that the operation of drossing had accelerated the laborer's death and that the man might have lived for some years still if he had not done his work that day and had refrained from such work thereafter. The trial court made an award in his favor, which the English Court of Appeal and the House of Lords, in

James V. Partridge Jones & John Payton, Ltd., 102 L. J. K. B. 760, (1933) A. C. 501, 26 B. W. C. C. 277, subsequently affirmed. Lord Buckmaster, with whom concurred Lord Russell of Killowen and the other law Lords, in the course of his judgment said:

"If, in the normal course of his work, owing to the imperfect condition of his arteries or whatever other internal organ may have been diseased, he breaks down and dies, the appellants' case is that, although the work contributed to the death, that is not sufficient unless you can point to a specific injury resulting from a specific act. That would also appear to have been the view of the learned county court judge, if he had not thought that authority was too strong for him.

"My Lords, whatever may have been said about the merit of that argument some twenty years ago, it appears to me it is impossible to be effectively advanced today, while this House, as well as all the other Courts, are bound by what was done in the case of Clover, Clayton & Co. v. Hughes, (1910) A. C. 242; 3 B. W. C. C. 275."

The case last above reviewed was subsequently followed by the House of Lords in the comparatively recent decision of Lochgelly Iron & Coal Company, Ltd. v. Walkenshaw, S. C. (H. L.) 36; (1935) Sc. L. T. 391. There a brusher in a colliery who had been performing this sort of labor for some two years, was engaged in his ordinary work on the night shift. He had been brushing a road to a height of nine feet, the coal four and one-half feet thick having been worked out and he was trying to bring down part of the roof, working with a pick above the level of his head. This was a common operation in connection with brushing work, a pick being used where the brushing was soft and explosives when it was hard, and he had encountered similar conditions before. He had just decided that a pick would not do and that a shot would be required, when he felt a pain in his chest and a choking sensation in his throat. He worked the rest of the shift

intermittently, but felt sick and complained of pain. After the shift was completed he walked to the bottom of the shaft and then walked home from the shaft head. He never worked thereafter, being totally incapacitated to do labor, though not confined to bed. His last night's work was of a normal nature.

The trouble which came upon him then was heart failure due to a condition of arteriosclerosis, causing in turn enlarged heart and probably kidney affection. This condition was of long standing, was progressive and sooner or later there was certain to be a cardiac breakdown. The cause of the trouble was found by the trial court to be the state of the claimant's heart and arteries and the heavy brushing work he did during the shift mentioned. Had he not been doing work which was too hard for him in his physical condition, the breakdown would not have been so sudden and would not have taken place when it did. The award of the trial court in favor of the workman was affirmed by the Scottish Court of Session and by the House of Lords.

It will be observed from the survey of these cases that the doctrine in the decision of Clover, Clayton & Co., Ltd. v. Hughes, supra, has been the law of England for more than a quarter of a century.

In this country courts of reputable authority, in jurisdictions where the provisions of their workmen's compensation statutes have similar requirements relative to the injuries covered, as England and Wyoming, have followed in large measure the reasoning of the English judges. For example, in Maine personal injuries by accident arising out of and in the course of the employment are compensable. In that state it was held that a finding that a workman's death was covered by the law was supported by the fact that he died of cerebral hemorrhage which came on when he was lifting one end of a 100 pound sack of grain in the course of

his employment; that the workman was at the time suffering from diseased arteries which predisposed him to such attack and that he might have died in his bed in a week had he not lifted the sack did not affect the question of the employer's liability under the statute. Consequently an award in favor of the workman's widow was affirmed. Patrick v. J. B. Ham Company, 119 Me. 510, 111 Atl. 912, 13 A. L. R. 427.

The subsequent case of Brown v. Otto Nelson Company, 123 Me. 424, 123 Atl. 421, 60 A. L. R. 1293, decided that acute dilation of the heart of a laborer, due to shoveling snow, was an accident and compensable, though the work was similar to that ordinarily performed by him and despite the contention that what occurred was the development of disease.

In New Hampshire, the controlling law being as stated above, the case of Guay v. Brown Company, 83 N. H. 392, 142 Atl. 697, 60 A. L. R. 1284, determined that the sudden collapse, shortly followed by the death of a workman, arising from the effect of hard labor on a diseased heart, was compensable.

Maryland's Workmen's Compensation Law also embraces injuries which are personal, accidental and arise out of and in the course of employment. In Geipe, Inc. v. Collett, (Md.) 190 Atl. 836, 109 A. L. R. 887, it was held that the injury suffered by a truck driver, who, in consequence of excitement accompanying an unsuccessful effort to avoid striking a man unexpectedly jumping from the tail gate of another truck which he was closely following, experienced a paralytic stroke, was accidental and compensable. There was medical testimony in the case to the effect that the workman had arteriosclerosis with high blood pressure, of which he was unaware, which might not have caused any disablement for years, but which due to the above mentioned occurrence had definitely precipitated the rup-

ture of a blood vessel in the brain, with resultant hemorrhage and paralysis.

The Illinois Workmen's Compensation Law likewise covers accidental injuries arising out of and in the course of employment. Where steel rails were joined by an electric welding arc manipulated by a workman and the glass in the protecting hood he wore broke, allowing his eyes to meet the dazzling light emitted for a moment, while he was shortly afterwards able to go on with the work, his sight subsequently gradually failed until he was no longer able to continue in employment. Much evidence appeared in the case tending to show that the loss of sight was not due to this occurrence but to a pre-existing disease, though he had previously never had any trouble with his eyes. Immediately after the happening his eyes began to pain the workman. Holding an award made him should be upheld, the Supreme Court of Illinois in Rockford Traction Co. v. Industrial Commission, 295 Ill. 358, 129 N. E. 135, remarked that:

"Though it may be conceded that Gould was suffering from a pre-existing disease that would eventually have affected his eye-sight, we think it fair to conclude from the evidence in this record that the blindness developed as a result of the injury. Compensation may be awarded although there is a pre-existing disease, if the disease is aggravated and accelerated by an accidental injury in the course of the employment."

See also Aladdin Coal & Mining Co. v. Industrial Commission, 308 Ill. 35, 139 N. E. 30.

The scope of the New Jersey compensation law as to injuries covered is phrased like the other statutes we have above mentioned. In Matthews Construction Co. v. Ranallo, 13 N. J. Misc. 878, 181 Atl. 901, it appeared the workman was employed to dig a ditch with pick and shovel. While so engaged he bent down, endeavored to push the shovel into the earth and experienced

a pain of such severity that he was unable to continue his work. It developed that the workman had a history of osteo-arthritis, but it was dormant on the day he was at work on the ditch. It was found that the twisting of his back while exerting himself in and about his duly appointed labors caused the osteo-arthritis to light up. The award made in favor of the workman was affirmed by the New Jersey Supreme Court, and this was said:

"The only question argued is whether or not the common pleas court was correct in deciding that the injury alleged to have been received by the workman arose as the result of an accident within the meaning of the compensation act. A sprain such as that found to have been experienced by the workman in the instant case has been held to be an accident within the purview of the Workmen's Compensation Act, Van Meter v. E. R. Morehouse, Inc., 179 A. 678, 13 N. J. Misc. 558, Marotta v. Fabi, 13 N. J. Misc. 690, 180 A. 545; and it is settled by many decisions cited in the Van Meter Case that there may be a recovery for an injury caused by an accident, although there was a diseased bodily condition prior to the injury which, it may be inferred, would have remained more or less dormant if not weakened by the accident."

This case was subsequently affirmed, 117 N. J. L. 148, 187 Atl. 372.

In Oklahoma the personal injury covered must be "accidental" and "arise out of and in the course of the workman's employment" to be compensable. Under this law the case of Winona Oil Co. v. Smithson, 87 Okla. 226, 209 Pac. 398, arose. Its essential facts were that Smithson, while in the employ of the oil company, went to a store dealing in oil company supplies to get some tools for his employer. Having obtained them, he started out of the store to his car and stepped off a platform about two and one-half feet high, with the tools in his arms. He received a severe jar, which caused the rupture of a blood vessel and hemorrhage

in vitreous of left eye, he thereby permanently losing its use for all practical purposes. An award was made him by the State Industrial Commission for the loss of that part of his vision. The employer contended that there was no accident, but the Supreme Court of Oklahoma held otherwise and affirmed the award. It is interesting to note that in this case there seems to have appeared no evidence whatsoever of pre-existing disease.

The workman in Pennsylvania in certain employments is compensated for personal injuries by accident in the course of his employment. In Heister v. Hunter, 89 Pa. Sup. Ct. 393, the testimony disclosed that the claimant was engaged in digging a post hole in stony ground and while using a crowbar struck a stone with such force as to jar his body, immediately following which he sustained a hemorrhage of the left eye. This caused total blindness in that eye. Medical witnesses said that the hemorrhage was produced by the jar. Affirming the award made the claimant the court indicated that while "the eye was somewhat infirm before the injury and may have been more susceptible to the effect of a jar than if it had been in a normal condition as suggested by one of the witnesses, but that is not a controlling consideration in the case." See also Falls v. Tennessee Furniture Co., 122 Pa. Sup. Ct. 550, 186 Atl. 272; Witt v. Witt's Food Market, 122 Pa. Sup. Ct. 557, 186 Atl. 275.

Additional cases dealing with the questions involved and in line with those above cited could easily be supplied, but we think enough have been reviewed and enough of the record in the case at bar outlined to enable us to say that our conclusion that the judgment of the district court awarding Scrogham compensation for the blindness in his left eye, is supported not only by ample and cogent authority but by the evidence as well.

The testimony is clear that respondent had never noticed any red color when looking at a light previous to the happening on December 27, 1935; that on that day when he had lifted the heavy sack of beans to the top of the pile, he for the first time noticed that condition. Medical experts who testified on the trial all say that he would notice red color when looking at a light immediately upon a hemorrhage taking place and that the strain of lifting could produce the rupture of the blood vessels of the eye in their then condition. The inference is irresistible, as we view the evidence, that the workman suffered a compensable injury. That this personal injury was an accident, that it arose out of his employment and that it made no difference that the blood vessels in the workman's eye were abnormally weak, whether this came by disease or existed from birth, so far as the right to compensation is concerned, is abundantly established through the reasoning of the decisions above considered.

As already intimated, we are quite well satisfied that their logic is sound and may safely be followed. They harmonize with the liberal construction of the Workmen's Compensation Law, which we have repeatedly said would always be applied to problems of this character. It may not be amiss to note also that unusually heavy sacks of beans were lifted by the workman when no scales were under the hopper, and there appeared to have been none on December 27, 1935, when the accident happened to Scrogham. So he would clearly have been subject to some extra strain at least in his work on that day. However, we do not think this fact controlling. Compensation is not made to rest under our law upon the condition of health of the employee or upon his freedom from liability to injury through a constitutional weakness or latent tendency. An award is made for an injury which is a hazard of the employment, and as said by the Supreme Court of Massachu-

setts in the case of In re Madden, 111 N. E. 379, 222 Mass. 487, L. R. A. 1916D 1000, "it is the hazard of the employment acting upon the particular employee in his condition of health and not what that hazard would be if acting upon a healthy employee or upon the average employee. The act makes no distinction between wise or foolish, skilled or inexperienced, healthy or diseased employees. All who rightly are describable as employees come within the act."

The employer contends also that no award could rightly be made in favor of respondent on account of the condition of his right eye. We are obliged to say that in the state of the record before us that contention must be upheld. The record is barren of any testimony indicating just when the hemorrhages in the right eye occurred. For all that appears they may have resulted from work at home, in scuffling with fellow workmen, in walking about on Scrogham's own personal business, or lifting weights in his own home. The medical witnesses all concur in stating that the eye hemorrhages could have been brought about in any of these ways. The burden is on the claimant to show that he has experienced a compensable injury in the right eye before an award may be legally made him for that. In the trial had he did not carry the burden in that respect in this case.

We accordingly must affirm the judgment of the district court in so far as it awards compensation for the left eye and reverse it as it undertakes to make an award for the loss of the workman's right eye, with instructions to grant a new trial of the issues as to that matter. Each party will pay his own costs in this court.

*Affirmed in part, reversed in part, with instructions.*

BLUME, Ch. J., and KIMBALL, J., concur.