2001 WY 101

In the Matter of the Worker's Compensation Claim of Emily Ann BUCKLIN, An Employee of Big Horn County Sheriff'S Department:

Emily Ann Bucklin, Appellant (Petitioner),

v.

State of Wyoming, ex rel., Wyoming Workers' Safety and Compensation Division, Appellee (Respondent).

No. 00–325.

Supreme Court of Wyoming.

Oct. 19, 2001.

Representing Appellant: George Santini of Ross, Ross & Santini, Cheyenne, WY.

Representing Appellee: Gay Woodhouse, Attorney General; John W. Renneisen, Deputy Attorney General; and David L. Delicath, Assistant Attorney General.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

HILL, Justice.

[¶ 1] Appellant, Emily Ann Bucklin (Bucklin), appeals from an order of the district court that affirmed a determination of the Medical Commission (Commission), which denied most of the worker's compensation benefits Bucklin sought. It is not disputed that Bucklin was injured while at work when a top-heavy file cabinet fell onto her shoulder and arm while she was in a sitting position. As a result of that occurrence, Bucklin sought medical attention. In the course of her treatment, it became evident that there existed a fracture or cancerous lesion in her cervical spine (neck). Because Bucklin had been treated for breast cancer in 1984, the treating physicians considered metastases a possible diagnosis prior to the surgical procedures necessitated by her condition. However, Bucklin needed immediate surgical intervention to stabilize her spine,

and it was not until the surgery was completed and a biopsy performed that the presence of cancer was confirmed. The treating physicians testified that they could not definitively sort out the interaction of the work-related injury and the metastases, but their testimony was clear that the source of Bucklin's pain and the event that made the surgery an immediate requirement was the on-the-job injury. That is, Bucklin's injury at work, combined with a weakness in her neck, produced a condition that required the treatment provided by Bucklin's physicians. The ultimate conclusion reached by the Commission was that Bucklin had failed to show, by a preponderance of the evidence, that the treatment and surgery of her neck and shoulder injury stemming from her work injury *were not* related to a preexisting cancer and *were* related to her work injury. The district court entertained Bucklin's petition for review of agency action pursuant to W.R.A.P. 12, and it concluded that the Commission's determination was based on substantial evidence.

[¶ 2] We will reverse and remand to the district court for further remand to the Commission, with direction that Bucklin's just claims be paid by the Workers' Compensation Division (Division).

## ISSUES

[¶ 3] Bucklin poses these issues:

1. Did the Medical Commission err as a matter of law in denying Bucklin's claims for treatment of her work related neck and shoulder injuries?

2. Did Bucklin's employment activities aggravate, accelerate or combine with her pre-existing undiagnosed condition of cancer to result in a compensable injury?

3. Can the Medical Commission make a factual finding regarding causation which is directly contrary to the uncontroverted medical testimony before it?

The Division states a single issue:

Did the Medical Commission correctly conclude that Appellant's surgery was not necessitated by her accident at work?

## FACTS

[¶ 4] On March 24, 1984, Bucklin was diagnosed with breast cancer. She underwent a modified radical mastectomy in March of 1984, and that was followed by two years of chemotherapy. Over the succeeding years, Bucklin did routine semi-annual, and then annual, follow-up visits to her oncologist, Neel Hammond, M.D. (and for the years 1993–1996 to another physician), and all check-ups were negative through and including October or November of 1997.

[¶ 5] On August 18, 1998, while employed as a dispatcher for the Big Horn County Sheriff, Bucklin was injured when a three-drawer file cabinet toppled onto her left arm and shoulder. Bucklin was seated in a rolling desk chair at the time. She felt immediate pain and assumed that she had pulled a muscle "or something of that nature." Bucklin was able to complete the remaining three and one-half hours of her work shift, but her pain worsened over the following days. On August 24, 1998, Bucklin consulted with R.C. Wecker, M.D., an orthopedic surgeon. Dr. Wecker's notes indicate that Bucklin complained of pain in her shoulder and "in her neck, posterior shoulder, arm and shoulder area". He concluded that Bucklin may have suffered two injuries, one to the shoulder and one to the neck. Therefore, he sent Bucklin to get an MRI of her cervical spine and asked that she return on September 1, 1998, which she did.

[¶ 6] The MRI report contained these "Impressions:" "1. Abnormal marrow signal C7 as well as the transverse process of T1 on the left. Neoplastic process such as metastatic disease is considered. There is, however, no evidence of neural impingement. 2. Mild cervical spondylosis C5–6." Dr. Wecker's notes of Bucklin's September 1, 1998 appointment were as follows:

Patient returns today for follow up on injury to her neck and left shoulder. The MRI of the left shoulder was negative for any rotator cuff tear or obvious abnormality, other than slight hypertrophy of the acromioclavicular joint, which is probably not a new finding.

*TEST RESULTS:*

The MRI of her neck however, demonstrated an increased uptake, or abnormal signal intensity, in the body of the C7 vertebrae of the cervical spine, which could represent a fracture vs. some type of bone lesion such as a tumor infiltration, etc. As the patient does have a prior history of carcinoma of the breast with mastectomy performed in 1984 I recommended today that we proceed with a bone scan to evaluate not only her cervical spine, but the total body for a possibility of metastasis vs. fracture of her cervical spine, which may have occurred from this injury. The patient was referred down to the Radiology Dept. where she was injected and a bone scan will be performed yet today so that we can get this evaluated promptly.

The patient had the bone scan performed here in the Thermopolis Hospital today which revealed a localized area of marked increased uptake in the body of the C7 vertebral body, but no other areas of increased uptake were noted on the entire total body bone scan survey, suggesting no other metastatic lesions or the fact that the C7 vertebrae may indeed be a fracture rather [than] a metastatic lesion. Based on this finding, the radiologist suggested that we perform a limited CT scan of the area of C6, 7 and T1, which was performed today to evaluate the possibility of fracture and it appears that the patient has a lytic lesion, or replacement type lesion, of the body and a portion of the pedicle and extending out into the transverse process and posterior lamina of C7, more on the left side, which is consistent with her referred pain being more into the left shoulder area and left posterior neck. The appearance of the CT scan suggests that this was more of a metastatic or evasive type lesion than a fracture, although I suspect that the patient's recent trauma was probably enough to cause a pathological fracture through the previously weakened area of the C7 vertebral body and was therefore the cause of her sudden increased pain as she had been totally asymptomatic prior to that accident of the file cabinet falling on her.

[¶ 7] Dr. Wecker recommended that Bucklin further consult with her oncologist and a neurosurgeon in Billings, Montana. She saw Fred McMurry, M.D., a neurosurgeon, as well as one of his associates in the practice of neurosurgery, on September 3, 1998. It is evident from Dr. McMurry's deposition testimony, which was presented to the Commission in the form of a transcript, that he was anxious to get to the heart of the matter:

She [Bucklin] had a cancer and I assume what we're meeting here about today is the relevance of any work related event.

She had developed a pain and that was why she was seen. The pain came on actually while she rolled a chair while carrying out some office work and there was quite a bit of severe pain after that moment of injury.

And in the course of the evaluation, then, this, basically, will summarize the case. There really was a problem and it turned out that there was an abnormal area that contained a malignant cancer that had migrated from another location in her body.

But the moment of onset of symptoms came on when she was, when she twisted at work. I think the mechanical change that occurred there that pinched the nerve I'm sure did happen while she was at work.

It turns out, you know, that underlying this area there was another abnormal area, you know, perhaps the tissues were weakened by the cancer. But at the time she developed symptoms she had a work related injury and so that's really what this is all about.

[¶ 8] Counsel for the Division spent the next 12 pages of the deposition trying to get Dr. McMurry to change that simple and straightforward analysis, but he did not budge from it. Rather, Dr. McMurry's testimony remained consistent that the on-the-job injury was the immediate cause of the need for her surgery. For example, when asked if anyone treated Bucklin for a "fracture," McMurry replied:

Now when we use the term fracture, the entire bone was disrupted and, basically, replaced by a very abnormal tissue and it

was the kind of bone that was vulnerable to injury.

If we would describe this in comparison to someone who might say fall off a motorcycle and have a contusion to the neck with a fracture, the actual findings would look quite different.

But the mechanism of injury or the mechanism of pain, I guess, what caused the pain, involved a compression of this abnormal tissue that really was softer than normal bone and portions of disc and bone material had pushed up against a nerve.

Now her problem was a pinched nerve in lay terms and it was, certainly happened at the moment, I don't think there's any question it happened at the moment we just discussed [the toppling file cabinet injury].

But your question having to do with the fracture, you know, we're dealing with a very different appearance on these images because there's actually destruction of bone in this area. So it's a different kind of finding on the images.

In one case, you'd have a cracked through normal bone and in another case you've got a normal bone that's been replaced by a growing tissue that's actually destroying the bone and the disruption of that tissue.

. . . .

And, you know, when you're starting out with a weakened structure and undoubtedly that was developing and, I'm sure, at the time of injury there was a sudden change in the structure there because of the injury.

[¶ 9] Bucklin saw Dr. Hammond on September 4, 1998. Bucklin had previously consulted with Dr. Hammond as her treating oncologist from 1984–92 and then again in 1997. He confirmed that the treating physicians suspected there was cancer present, but only surgery could confirm that suspicion (a needle biopsy was not a safe procedure to perform at C6–C7). The surgery was necessary to stabilize Bucklin's spine but also had the added benefit of producing a diagnostic function (to remove tissue and test it for malignancy). Hammond's role, pre-surgically, was to insure that there were no breast cancer problems other than the one suspected at C7. Dr. Hammond was able to agree with the Division's position that Bucklin's work did not cause her cancer, but in virtually all respects, within the range of his expertise (which was oncology and not neurosurgery, radiology, or orthopedics), Dr. Hammond buttressed the testimony of Drs. McMurry and Wecker that Bucklin's problem arose because she suffered an injury at work and, further, that she was more susceptible to such an injury because of the condition of the bone in her spine at C7, *i.e.*, the bone likely would not fracture without the cancer being present, but also, bone that would not fracture unless there was some trauma.

[¶ 10] On September 22, 1998, surgery was performed to remove that portion of Bucklin's cervical spine that was causing her problems, a bone graft was used to stabilize her spine, and a tumor was removed from that area. The thrust of the Division's objection to Bucklin's claim is found in this exchange during Dr. Hammond's deposition:

Q. [by counsel for the Division] Okay.

And here's where we are. Of course, I represent the Workers' Compensation Division.

She had this accident at work which caused a pinched nerve, and the Division's [*sic*] received bills from health care providers which total over $35,000 and, you know, a [*sic*] typically a pinched nerve repair doesn't cost anywhere near that much.

And maybe this is beyond your abilities, Doctor, but is it likely or possible that much of the treatment or some of the treatment was for the preexisting condition and ought to be paid by someone else?

A. That's—

MR. BANCROFT: Is that George laughing?

THE WITNESS [Dr. Hammond]: No, that's me laughing.

[¶ 11] The record both before the Commission and the district court is clear that the benefits at issue were only for the diagnostic and treatment services provided prior

to the neck surgery and the neck surgery itself. Bucklin did not seek benefits for any services related to cancer treatments that preceded or followed the surgery.

[¶ 12] The Division presented no medical testimony that contradicted that of Bucklin's treating physicians.

## STANDARD OF REVIEW

[¶ 13] Our standard of review in a case such as this is well established. A claimant for worker's compensation benefits has the burden of proving all the essential elements of the claim by a preponderance of the evidence in the contested case hearing. When an agency decides that the party charged with the burden of proof has failed to meet that burden, the case is reviewed under the "[a]rbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" language of Wyo. Stat. Ann. § 16–3–114(c)(ii)(A) (LexisNexis 2001). On appeal, the complainant has the burden of proving arbitrary administrative action. The agency, as the trier of fact, is charged with weighing the evidence and determining the credibility of witnesses. The deference normally accorded to the findings of fact by a trial court is extended to the administrative agency, and the agency's decision as to the facts will not be overturned unless it is clearly contrary to the overwhelming weight of the evidence. Demonstrating evidentiary contradictions in the record does not establish the irrationality of the ruling, but we do examine conflicting evidence to determine if the agency reasonably could have made its finding and order based upon all of the evidence before it. *Lunde v. State ex rel. Wyoming Workers' Compensation Division*, 6 P.3d 1256, 1258–59 (Wyo.2000). In this case, the hearing was before the Commission, but our standard of review is no different than it would be where the hearing is conducted before a hearing officer. Wyo. Stat. Ann. § 27–14–616(b)(iv) (LexisNexis 2001).

## DISCUSSION

[¶ 14] The evidence adduced before the Commission compels us to eliminate the topic of a preexisting condition as determinative in the resolution of this case. The presence of a preexisting condition, or at least the failure of Bucklin to prove that a preexisting condition was not the source of her problems was, of course, the basis for the Commission's denial of benefits. In a case where a worker suffered a hemorrhage to his eye during the performance of strenuous work, we held that an infirmity in the worker's blood vessels did not preclude an award of benefits. *In re Scrogham*, 52 Wyo. 232, 73 P.2d 300, 307 (1937):

The testimony is clear that respondent had never noticed any red color when looking at a light previous to the happening on December 27, 1935; that on that day when he had lifted the heavy sack of beans to the top of the pile he for the first time noticed that condition. Medical experts who testified on the trial all say that he would notice red color when looking at a light immediately upon a hemorrhage taking place and that the strain of lifting could produce the rupture of the blood vessels of the eye in their then condition. The inference is irresistible, as we view the evidence, that the workman suffered a compensable injury. That this personal injury was an accident, that it arose out of his employment, and that it made no difference that the blood vessels in the workman's eye were abnormally weak, whether this came by disease or existed from birth, so far as the right to compensation is concerned, is abundantly established through the reasoning of the decisions above considered.

As already intimated, we are quite well satisfied that their logic is sound and may safely be followed. They harmonize with the liberal construction of the Workmen's Compensation Law, which we have repeatedly said would always be applied to problems of this character. It may not be amiss to note also that unusually heavy sacks of beans were lifted by the workman when no scales were under the hopper, and there appeared to have been none on December 27, 1935, when the accident happened to Scrogham. So he would clearly have been subject to some extra strain at least in his work on that day. However, we do not think this fact controlling.

Compensation is not made to rest under our law upon the condition of health of the employee or upon his freedom from liability to injury through a constitutional weakness or latent tendency. An award is made for an injury which is a hazard of the employment, and as said by the Supreme Court of Massachusetts in the case of *In re Madden,* 222 Mass. 487, 111 N.E. 379, 382, L.R.A. 1916D, 1000, "it is the hazard of the employment acting upon the particular employé in his condition of health and not what that hazard would be if acting upon a healthy employé or upon the average employé. The act makes no distinction between wise or foolish, skilled or inexperienced, healthy or diseased employés. All who rightly are describable as employés come within the act."

[¶ 15] The governing principle enunciated in that decision is mirrored by the legal encyclopedias:

A denial of compensation is not warranted merely by the existence at the time of the accident of a latent or pre-existing defect or disease which is aggravated, accelerated, or lighted up thereby, or of an impaired body structure, notwithstanding, except for such disease or impaired condition, the injury would not have occurred, for the condition is deemed not the cause of the injury but merely a condition which enabled the cause to become operative. The fact that the employee's disability did not result from the injury, but through the disease which the injury aggravated, accelerated, or lighted up, does not prevent liability, for the claim is not based on the disease but on what the injury did to the disease.

99 C.J.S. *Workers' Compensation* § 328 (2000).

Every worker brings with him to his employment certain infirmities. For purposes of workers' compensation an employer takes an employee as he finds him at the time of his employment, and assumes the risk of having a weakened condition, such as alcoholism or cancer, aggravated by some injury which might not hurt or bother a perfectly normal healthy person.

82 Am.Jur.2d *Workers' Compensation* § 317 (1992).

[¶ 16] We hold that the district court erred in affirming the Commission's determination that Bucklin "failed to show, by a preponderance of the evidence, that treatment and surgery of her neck and shoulder injury were not related to a preexisting cancer and are related to her work injury of August 18, 1998." The expert medical testimony adduced before the Commission established, without a doubt, that there was a preexisting cancer. However, according to that same expert medical testimony, its only role under the circumstances of this case was to predispose Bucklin to the sort of injury that she suffered while at work. Bucklin's treating physicians were unanimous in opining that the cause of the problem which necessitated surgery was the accident that occurred while she was at work, and there is no evidence in the record to contradict those opinions.[1]

## CONCLUSION

[¶ 17] The order of the district court affirming the Commission's determination is reversed, and this matter is remanded to the district court with directions that the Commission's determination be reversed and the Division be directed to pay the benefits at dispute in this matter.

There is no way a reviewing court can reach the "subjective determinations" by individual Commission members.

1. *See Devous v. Board of Medical Examiners,* 845 P.2d 408, 418 (Wyo.1993). As we did in *Devous,* here, we also acknowledge and accept the expertise of the Commission. However, "[I]f judicial review has any purpose, it must be exercised by objectively evaluating evidence in the record."