IN THE MATTER OF THE COMPENSATION
CASE OF NOVA WRIGHT,

*Employee-Claimant and Appellant,*

vs.

WYOMING STATE TRAINING SCHOOL,

*Employer-Defendant and Respondent.*

(No. 2586; March 31st, 1953; 255 Pac. (2d) 211)

For the claimant and appellant the cause was submitted upon the brief of William A. Smith, County and Prosecuting Attorney of Lander, Wyoming.

No appearance for defendant and respondent.

## OPINION

RINER, Justice:

This case arose under the Workmen's Compensation Law of the State of Wyoming. Nova Wright employee and claimant, here the appellant, and usually so designated herein or by her given and surnames, brings these direct appeal proceedings against the Wyoming State Training School, the employer and now the respondent herein. The respondent will hereinafter be usually designated as the "School" or as the defendant. The school is located at Lander, Wyoming. Mrs. Wright, was, previous to the date of the illness she suffered, an employee of the school and worked in the dispensary thereof. Her claim for award reads in its material portion as follows:

"2.   That said employee was injured as above stated at the time and in the manner following to-wit: Dermatitis covering the entire body, while working in the dispensary which is part of the Infirmary, caused by contact of some medicine. As the result of said injury Employee is claiming compensation for October 18 to December 18, 1951 in the amount of $184.00.

"3.   That said accident was not due solely to the culpable negligence of the employee herein.

"4.   That an award of compensation from the Industrial Accident Fund of the State of Wyoming should be made as provided by the 'Workmen's Compensation Law' of said State.

"5.   That as a direct result of injuries the employee has been incapacitated from performing any work at

any gainful occupation from the 18 day of Oct. 19......,
to the ...... day of ......, 19......, (both dates inclusive),
and that said employee has not fully recovered."

The Lander Medical Clinic presented a claim against
the Workmen's Compensation Fund in the sum of
$38.00 for services rendered Mrs. Wright. As will be
presently seen both of these claims were denied by the
presiding District Court Judge and this appeal was
ordered by him. The facts involved are very little in
controversy—if at all. An abstract of the testimony
submitted in the case is as follows:

*Mrs. Wright* testified in her own behalf claiming an
award for a skin infection, which the doctor she con-
sulted, classified as dermatitis. This trouble consists, as
she explained, thus: "Well, I don't really know how
except that at the time I took violently sick, they say
I swelled up twice my normal size and started losing
my skin, and when it left, it left more or less blotches
like I still have. I still have the dermatitis." That she
became sick and consulted the doctor and: "It started
in April, I consulted the doctor for the state school, Dr.
Wilmoth about it at that time, it wasn't too bad, I
didn't think too much about it, then I got terribly sick
and contacted the doctor October 18, 1951." She testi-
fied that she had never suffered or been subject to any
such attack or any sickness prior to this in her lifetime;
that no reason was given for the cause of this trouble;
that she does not remember right off-hand but she
could have had skin abrasions on her body with the
work that she was doing at that time. At the time she
became sick she was working in the dispensary in an
infirmary at the Wyoming State Training School. In
the course of her duties at the infirmary she gave med-
icine and things like that. At the time she became ter-
ribly sick she received treatments for this dermatitis
and the first treatment was received in October 1951;

that she has subsequently received treatment since then by Dr. Holtz. Dr. Holtz sent her down to Dr. Lingenfelter, of Denver, who examined her and gave her treatment during the latter part of November or December 1951; Dr. Lingenfelter then returned her to Dr. Holtz for further treatment. She has not worked at the infirmary since becoming sick and has not been able to work in any capacity since that time. She actually ceased working in the infirmary about October 16, 1951; that at the time of the hearing she was not able to work. The doctors have not told her when she will be able to go back to work. The reason she is unable to go to work at this time is because she still has dermatitis and that she has been unable to check it or clear it up. She does not believe the trouble to be contagious as she has four youngsters and neither they nor her husband have contracted it. She is still receiving treatment from the doctors and as yet they have not released her to go to work. The doctor who is treating her is giving her cortone shots; Dr. Lingenfelter, in Denver, had her take phenolbars and concentrated oatmeal and also gave her therapy treatment in his office. His diagnosis of the trouble is dermatitis.

In April 1951 she noticed a breaking out or rash which would come and go and she stated that there was a case in the infirmary and some of the children were being treated with alum lotion and this was the lotion which was being used at the time she became terribly sick. She had been using the lotion in April when she first noticed the rash. She continued to work from the first appearance of the rash until about October 18th. On October 16, she had quite a rash on her leg so she consulted Mr. Wilson, the Superintendent of the Training School, about it. He said for her to consult a doctor and find about it. She then consulted Dr. Holtz on the 16th of October 1951 and he advised her not to go back

to work any more. She did not go back to work and her husband had to call the doctor and he took her to the hospital; at that time she was terribly sick. During the night of October 18th, 1951, she swelled terribly and as a result was taken to the hospital and remained there for two weeks under the care of Dr. Holtz. After that she was released and went back to her home where Dr. Holtz continued to treat her; that he then sent her to Denver to Dr. Lingenfelter in November 1951; that she was in a hospital in Denver about two weeks altogether. Mrs. Wright testified the solution she was using to treat the children at the infirmary has a mercury content; that she doesn't really know that she was able to contract skin trouble such as dermatitis from the nature of her duties in the infirmary; that she had never had anything like it before. A Mrs. Wardell replaced Mrs. Wright in the job at the dispensary; that Mrs. Wardell contracted this same afflication and she had to quit to go to a doctor. Mrs. Wardell was replaced by Mrs. Winkelman who is at the present time working in the dispensary. The claimant has reason to believe the mercury in this solution aggravated or brought out this dermatitis because at the time she first became sick the doctor she contacted advised her she had contacted poison. That's all she had to go on.

*Mr. G. M. Wilson,* Superintendent of the Wyoming State Training School, testified that he is reasonably familiar with the sickness of Mrs. Wright; that he is not a physician but was her employer; her sickness first came to his attention in April 1951 when he saw her arms and wrists. They were inflamed. The case was then referred to Dr. Wilmoth, the School's physician, who suggested some palliative treatment and either the treatment or the general condition of Mrs. Wright resulted in the condition being alleviated for

a time. There were two or three times during the summer when it was brought to his attention by Mrs. Wright that she was troubled with itching and breaking out—sometimes on her arms and wrists, sometimes on her neck then on the day Mrs. Wright states, she became unable to work and was advised by Dr. Holtz not to work; Dr. Holtz called the Superintendent and told him Mrs. Wright had better not go back to work for a time. The dispensary has more medications and a larger supply of medicines in the adjoining cupboards and so on than in an ordinary doctor's office. That the school runs through the dispensary in a morning probably 25 or 35 patients for one reason or another and also from the dispensary medications are sent out for the entire institution, medications previously ordered by the doctor, and which are carried on in the wards. There has been a larger stock of drugs in the dispensary than would normally be found in a doctor's office or a hospital. Mrs. Wright's duties were that she was actively engaged in receiving these children as they came in from the wards in the morning, removing their dressings and applying medications or disinfectants or whatever had been ordered by the doctor or suggested by the nurse. Many of these conditions had not been seen by the doctor, simply treated by the nurse, but it was Mrs. Wright's primary job to take care of the conditions of these 25 or 35 children as they came in and also in sending out medications to the wards. Mr. Wilson stated the school did have one other employee in the infirmary at a previous date who suffered over a period of months or years with a persistent dermatitis, for which she also was treated in Denver, and which she still had at the time of her retirement in February 1949. Dermatitis is not a transmissible disease from person to person according to Mr. Wilson's opinion, but it can be contracted by one person as well as by a previous person from similar

quarters; that is, the similarity of causes resulting in several people who could get it. It is not to the Superintendent's immediate knowledge common for people to get dermatitis outside of working in the dispensary in the training school, but it is commonly thought certain preparations are more irritating than others and among these mercury preparations more than others are irritating to the skin. If one were susceptible, the Superintendent would say he would be running a risk of contracting dermatitis as an attendant at the dispensary, but there are many individuals who would not contract a condition of this kind from that employment —the majority of them would not; it is unusual for them to contract that trouble in the sense that people who did so would be in the minority. The Superintendent stated the skin irritation suffered by Mrs. Wright could be caused by many different and varied causes and not necessarily from preparations in the dispensary. There are drugs in the dispensary which he knows of that if actually applied to the skin would cause dermatitis. Since this happened to Mrs. Wright the school has had two other ladies who had similar symptoms after working at the same job, and upon the advice of Dr. Wilmoth a skin test was applied, some 10, 12 or 15 substances taken from the dispensary being used; this consisted of putting a little of the drug on the skin and covering the whole thing with gauze and adhesive and then waiting 24 hours; a good many of the substances caused a skin irritation. Another women preceded Mrs. Wright at the dispensary and she also had the same job as Mrs. Wright. She worked, according to the Superintendent's recollection, probably 15 years. She had this condition the last few years. Since Mrs. Wright had her trouble the school has had two employees contract dermatitis; neither of those cases were as serious as Mrs. Wright's—because, based on Mrs. Wright's experiences, they got out of there; whether

they had reason to get out of there or not he did not know but he did not blame them for wanting to change jobs. Mrs. Wright is considered a nurse's aid. She had been working in the dispensary prior to April 1, 1951, approximately six or seven months. The Superintendent also stated he asked the Board of Charities at Cheyenne when this matter came up about how to handle it and it was their suggestion that the School fill out Workmen's Compensation forms and it was the wish of the State Board of Charities that the matter not be contested; that is, it should be investigated on its merits, but not contested.

*Mrs. Ada Wardell* testified she worked as an attendant at the State Training School as an attendant or nurse's aid—whatever you want to call it. She stated she has worked there about 14 months and helped Mrs. Wright when she was there, starting at 8 in the morning and being off at 3 in the afternoon; she does not go in the dispensary any more, just to help out once in a while. She stated she contracted a skin irritation when she was there and Dr. Wilmoth treated her, telling her to take anidril and to apply hyspadal and serpatine ointment and that this treatment relieved the condition until last November. When she discovered the skin irritation last May she showed Mr. Wilson her arms and she stated that it would come and go; that at the time of testifying she was not suffering from it. Mrs. Wardell said the last time she suffered from the skin irritation was December or the latter part of November—or the beginning of December and she was off work for 17 days at that time, she would say about the 25th of November until the 11th of December, 1951; she did not file a compensation claim. Dr. Wilmoth looked after her at first; she went to Billings to see her own doctor who didn't happen to be there so she went to Dr. Larson, and witness stated: "He didn't know

me from Adam, he saw this skin irritation; I told him
about the other two ladies having it, and he said, 'It
seems to me it could be contact dematitis,' and then he
said 'I advise you to get out of the dispensary until it
clears up,' " and she did. Mrs. Winkelman took her
work over; the dermatitis would just start in between
the fingers. *There are quite a few things she has laid
off, one of them being septasal soap which she doesn't
touch any more and there are quite a few other things
it is best to stay away from.* (Italics supplied). She
had quite a few tests made and found quite a few things
to which she was allergic in the dispensary; some of
the tests made on her resulted in irritation of the skin
the same as that for which she had been treated; she
never before worked in a dispensary. The last time
she worked in the dispensary she took over Mrs.
Wright's work when she was ill; that would be from
the 17th or 18th of October, 1951, until the end of
November 1951 and then she went to Billings on the
25th of November.

*Mrs. Wilma Winkelman* testified she worked at the
Wyoming State Training School and has worked there
since July 1950; that she worked as a helper in the
dispensary when Mrs. Wright was there and she is
still occupied at that place; she is at the dispensary all
the time now; she first discovered she had this der-
matitis in October 1951; that she picked it up first from
just helping in the dispensary before she was working
in there steadily; sometime in October her skin was
breaking out; it got more serious after she took a
patch test; she even swelled after she took the test,
ammoniated mercury and alol lotion, and she was quite
sick from that test; there would be a breaking out
around each test; Dr. Wilmoth prescribed she take
Benedrin and use powder of benzol ointment. Dr. Wil-
moth treated her after she had had the dermatitis for

about a week. She stated she stayed away from certain things in the dispensary after Dr. Wilmoth treated her and she had not broken out again; she said she took other drugs as she had to have them. Mrs. Winkelman stated Mrs. Burns, the nurse, used those treatments, and she did not contract dermatitis to Mrs. Winkelman's knowledge. Mrs. Winkelman said she handled the same things as Mrs. Wright did; she did not wear rubber gloves or anything like that. She has been in the dispensary a little over two months. Dr. Wilmoth treated her after a patch test and told her to continue with the same treatment. It was not necessary for her to go to the hospital. Since that time she has not been bothered by it; she has not worked in a dispensary before.

*Superintendent Wilson* wanted to be heard again and stated that at the time Mrs. Wright became seriously ill he contacted the State Department of Health and the head of that Department sent an industrial chemist up to the training school, who looked the situation over and took samples of a number of products, and names and company addresses and a number of others, *made some recommendations in a report which followed, most of which they couldn't carry out, because he said, "Try to discontinue using some of these suspicious drugs,"; but Mr. Wilson said, "We don't find it possible to do without them."* (Italics supplied.) *Dr. L. H. Wilmoth*: His position with the State Training School is that of doctor and he has been engaged in that capacity for four years; he has been in the medical practice for 25 years; he knows Mrs. Wardell, Mrs. Wright and Mrs. Winkelman. He has treated them recently for dermatitis which is a general term; this specific type is what is called a contact dermatitis, which applies to the skin surfaces of the body; this comes in contact with some one or more substances

which are sufficiently irritating to the skin to make it break out into red spots, raised blotches that are irritating and burn and itch. It can be caused by numerous things. It is different from infection; infection usually means an infection by bacteria or yeast or mould. This dermatitis is usually thought to be purely a chemical irritation; it would be a disease. That in the case of Mrs. Wright, Mrs. Wardell and Mrs. Winkelman and as a result of examination and treatment he did not specifically discover what had caused the condition; *it is within his knowledge these three women were all working there at the time they contracted the disease. The nature of the drugs and equipment used in the dispensary is not a known source for employees to contract dermatitis; that the dispensary of course naturally uses a wide variety of drugs, chemicals, antiseptics and more particularly some of the arsenicals and mercurial products.* (Italics supplied) and that products are found—some of which, *all of which are known to sometimes cause contact dermatitis.* (Italics supplied.) It does not always cause this condition because many people can apparently work with those same things day in and day out without any skin eruption; that in the dispensary chemicals are handled which can cause contact dermatitis; *that considerable number of people can handle these things, chemicals, without developing dermatitis, so it is not always a condition that always follows.* (Italics supplied.) He would classify it then as an occupational risk; that he might be subject to such a disease. Ammoniated mercury or an ammoniated solution would have a particular effect on a person having dermatitis as both the liberated ammonia and the mercury itself are known to be of such toxic effect so that they would create a skin reaction in some people and they would have a tendency to aggravate an existing condition of dermatitis; that that would happen if the original dermatitis were due

to that same chemical; Mrs. Winkelman subjected herself to a patch test on her back with ammoniated mercury and she suffered a direct aggravated condition, as a result of that patch test which would indicate her original dermatitis was probably caused by something containing mercury; it is quite possible to have a severe enough chemical reaction to manifest itself by other signs and symptoms than a local skin reaction. A general toxic condition in which there is increased fluid in the tissues, swelling, small systemic symptoms. All that could have been the result of the original case of dermatitis; *it is not common for people working in dispensaries and around these drugs to contract dermatitis; that he is somewhat surprised to have a series of four or more cases in this particular dispensary. It is not a frequent occurrence. He does not know what proportion of persons do have it. There is an element of personal susceptibility to these drugs; all persons do not necessarily break out with contact dermatitis, some persons do, and some persons do not, in the same conditions;* (Italics supplied) that there is an individual susceptibility which makes one person more prone to react to those chemicals than another person.

After listening to the foregoing testimony the court stated he did not know the answer but in view of the language in the statute, that injury and personal injury shall not include a disease except that it shall directly result from an injury incurred in the employment, the award would be denied, and he desired the County Attorney as quickly as possible to get the matter to the Supreme Court.

The pertinent provisions of the law which are involved herein, all taken from the Wyoming Compiled Statutes 1945, are as follows:

Section 72-102 has this language:

"Compensation herein provided for shall be payable to persons injured in extra-hazardous employment, as herein defined, * * * Said compensation shall be payable from funds in the State Treasury to be accumulated and maintained in the manner herein provided. * * * "

Section 72-104 provides in part:

"The extra-hazardous occupations to which this chapter (article) is applicable are as follows * * * superintendents, supervisors and attendants employed at the Wyoming State Training School at Lander, Wyoming. * * * "

Section 72-106 (k) (1) states in part:

"The words 'injuries sustained in extra-hazardous employment,' as used in this chapter (article), shall include * * * 'injuries to employes, as a result of their employment and while at work in or about the premises occupied, used or controlled by the employer' * * * "

Section 72-106 (m) reads in full:

"The words 'injury and personal injury' shall not include injury caused by the wilful act of a third person directed against an employe for reasons personal to such employe, or because of his employment; nor a disease, except as it shall directly result from an injury incurred in the employment;"

It may be here observed that the law does not undertake to define the word "accident", but the term is frequently used in Section 72-111 W.C.S. 1945; that section dealing generally with reports of accidents by employees and employers.

It may be noted also that before making his final ruling in this matter the trial judge apparently made no examination of the statutory law or the authorities dealing with such a situation as we now have presented. He seems to have laid stress upon the last clause in section 72-106, subdivision (m) quoted above.

The final journal entry in the case appears in the record in the following language:

"This matter coming on for hearing this 13th day of February 1952, upon the order setting said case for hearing on the application of Nova Wright for compensation for October 18 to December 18, 1951, in the amount of $184.00, and a claim for doctor expenses therein; the applicant Nova Wright appearing in person and William A. Smith, County and Prosecuting Attorney, appearing in behalf of said applicant, and the employer-defendant being represented by G. M. Wilson, Superintendent of the Wyoming State Training School, who appeared in person, and testimony and evidence being heard by the Court, and the Court being fully advised in the premises,

"IT IS HEREBY ORDERED that the application and claim for award for compensation filed herein by the applicant and the doctor expenses for Lander Medical Clinic in the amount of $38.00 be and the same are hereby denied.

"IT IS FURTHER ORDERED that this case be taken before the Supreme Court of the State of Wyoming immediately for a decision thereon."

The State of Wyoming filed no brief in this case on behalf of the State Treasurer, the custodian of the Workmen's Compensation Fund. For the claimant, Mrs. Nova Wright, a brief was filed by the County and Prosecuting Attorney of Fremont County where the school is located.

We approach the disposition of this case with the rule in mind, which has been many times reiterated by this court that:

" * * * the Workmen's Compensation Law of this State should be liberally and reasonably construed to protect persons suffering casualties in industry and to avoid incongruous results." (Pope v. Safeway Stores, Inc. 54 Wyo. 266, 274, 91 Pac. (2d) 58).

See also the list of cases cited subsequent to the quotation above made as they appear on page 275 of 54 Wyoming. In addition it must not be overlooked that this court has heretofore indicated in Lichty vs. Lichty Construction Co. Wyoming, 243 Pac (2d) 151, that:

'Syllabus 5) "The policy of the Workmen's Compensation Act is to impose upon industry the burden of claims on account of injuries suffered by the workmen under it. * * * "

Our case in Re Scrogham, Associated Seed Growers, Inc. vs. Scrogham 52 Wyo. 232, 73 Pac. (2d) 300, presents many analogous features with the situation submitted at bar. That case also was one arising under the Workmen's Compensation Law of this state with the controlling and pertinent statutory clauses identical with those we now find before us. In the Scrogham case we held that blindness caused by a hemorrhage in the eye of the workman which happened after he had lifted a heavy sack of beans, and which was noticed by him after doing this, was compensable notwithstanding the workman was predisposed to such hemorrhage by a previous attack of tuberculosis which had healed, and regardless of whether the strain of lifting the sack was unusual.

It was pointed out in that decision that the right of compensation does not rest on the condition and health of the employee or his freedom from liability to injury through constitutional weakness or latent tendency, but the hazard of the employment acting upon the particular employee in his then state of health is compensated without distinction between employees as regards their state of health. Decisions of the courts of both England and America were reviewed extensively in reaching this concluson.

In the case last cited it was specifically contended

that the claimant's blindness was caused by disease and not from injury incurred in his employment and also that the primary cause of the hemorrhage in the claimant's eye was due to a previous attack of tuberculosis which had left an inherent weakness in claimant's body.

It would seem that the ruling of the court below in the case at bar was due to a narrow construction of the language of Section 72-106 subdivision (m) quoted supra and through overlooking the effect of our decision in the case of In Re Pero, Pero v. Collier-Latimer Inc. 49 Wyo. 131, 141; 52 Pac (2d) 690, where, after a review of the Wyoming Compensation Law provisions in its entirety we held:

"From a survey of the several sections of the Workmen's Compensation Law of this state we consider it fairly deducible that the injury for which compensation may be allowed is one arising through 'accident.' "

We stated in the Scrogham case that:

"An award is made for an injury which is a hazard of the employment, and as said by the Supreme Court of Massachusetts in the case of In re Madden, 111 N.E. 379, 222 Mass. 487, L.R.A. 1916D 1000, 'it is the hazard of the employment acting upon the particular employee in his condition of health and not what the hazard would be if acting upon a healthy employee or upon the average employee. The act makes no distinction between wise or foolish, skilled or inexperienced, healthy or diseased employees. All who rightly are described as employees come within the act.' "

In connection with the Pero case it may be well kept in mind the meaning of the word "accident" as that term is elaborately discussed by the Supreme Court of Missouri in the case of Tomnitz v. Employers' Liability Assur. Corporation, Limited, of London, England, 343 Mo. 321, 121 S.W. (2d) 745, 749. This case involved the proper interpretation of the words "bodily injuries ac-

cidentally sustained" found in an employer's liability policy, in this language:

"1 C.J.S., Accident, pp. 426-431, defines accident as follows: 'The word "accident" is derived from the Latin verb "accidere" signifying "fall upon, befall, happen, chance." In an etymological sense anything that happens may be said to be an accident; and in this sense, the word has been defined as a befalling; a change; a happening; an incident; an occurrence or event. In its most commonly accepted meaning, or in its ordinary or popular sense, the word may be defined as meaning a fortuitous circumstance, event, or happening, an event happening without any human agency, or if happening wholly or partly through human agency, an event which under the circumstances is unusual and unexpected by the person to whom it happens; and unusual, fortuitous, unexpected, unforseen or unlooked for. event, happening or occurrence; an unusual or unexpected result attending the operation or performance of a usual or necessary act or event; chance or contingency; fortune; mishap; some sudden and unexpected event taking place without expectation, upon the instant, rather than something which continues, progresses or develops; something happening by chance; something unforeseen, unexpected, unusual, extraordinary or phenomenal, taking place not according to the usual course of things or events, out of the range of ordinary calculations; that which exists or occurs abnormally, an uncommon occurrence. The word may be employed as denoting a calamity, casualty, catastrophe, disaster, an undesirable or unfortunate happening; any unexpected personal injury resulting from any unlooked for mishap or occurrence; any unpleasant or unfortunate occurrence, that causes injury, loss, suffering or death, some untoward occurrence aside from the usual course of events.' "

In line with the Scrogham case above reviewed and which represents the views adopted in the majority of jurisdictions it is held that individual allergy or weakness is immaterial if the particular conditions of employment in fact caused the disability.

One of the leading cases announcing this view is Le Lenko vs. Wilson H. Lee Company, 128 Conn. 499, 504, 505; 24 A. (2d) 253, decided in 1942. In that case a linotype operator became incapacitated by a dermatitis attributed to antimony fumes. There had been no other case of dermatitis in the company's plant which was a large one, and which had been operating many years. None of the physicians who testified in the case had had any experience with such a condition and even medical literature discussed few examples of it. The court remarked:

"Compensation under our law is not to be denied because the injury would not have occurred except for the peculiar susceptibility of the individual worker. * * * *an award of compensation is not precluded because* the risk is one which has not become generally recognized or *because only employees unusually susceptible will suffer from the disease. * * * *"

Webb vs. New Mexico Pub. Co. 47 N.M. 279, 141 P (2d) 333 was a case where proceedings were instituted to recover Workmen's Compensation for injuries resulting to the hands of a printer-operator through the use of a certain soap furnished by the employer. Previously the soap supplied by the employer had not given the employee any trouble but on August 28, 1940, the employer furnished a new brand of soap known as Lan-O-Kleen which had a base of lanolin and corn meal which the employee thereafter frequently used in washing his hands. The workman was highly allergic to this Lan-O-Kleen soap and as a result he suffered a contact dermatitis. Large painful eruptions broke out on the backs of his hands which developed to such an extent that about the latter part of February 1941 he became completely disabled for performing work. The use of this soap would not have caused the workman injury except for his allergy thereto. It could not have been reasonably expected that the use of this type of

soap would injuriously affect anyone. The injuries resulting constituted an unlooked for mishap which was nothing else than accidentally caused. There was physician's testimony in the case that corn meal was one of the soap's ingredients—and was used therein to remove grime worked into the workman's hands from the metal with which he worked; that corn meal and lanolin are things that certain people are violently allergic to; that these elements are not usually component parts of soap. An award to the workman was upheld. The New Mexico statute was substantially that injury and personal injury * * * shall not include a disease in any form except where it results naturally and unavoidably from accident in the employment.

Turning now to the record in the case at bar, the condensed abstract of the testimony in the case set forth as above sheds, as we think, abundant light upon the situation of Mrs. Wright as regards the work she was doing in the school, the consequences flowing from it and concerning what should be the disposition of the matter here.

From a careful survey of the testimony submitted it is apparent that the claimant suffered a severe attack of contact dermatitis; that she did not know she was susceptible to toxic reaction due to the chemicals used and handled in the school dispensary; that no one warned her that she might suffer as a consequence of her work; that chemicals were used in the dispensary which in some instances could and did cause contact dermatitis; that one of the women who worked in the dispensary was obliged to discontinue the use of the soap supplied by the school; it is true it is not shown that Mrs. Wright used this soap or how it affected her, but she undoubtedly washed her hands and very likely used the soap, and also used arsenical and mercurial chemicals in her work in the dispensary; that it was

proven that the dispensary used chemicals that would cause severe dermatitis and that certain susceptible attendants working in that department of the school were affected in this way by these chemicals; that under the authorities we have briefly examined above, the claimant suffered an accidental injury for which she should be compensated from the Workmen's Compensation Fund of this state. Our conclusion of the cause submitted is that the district court of Fremont County erred in making the ruling complained of here; that the order denying compensation in the sum of $184.00 to the claimant under date of February 13, 1952, and denying an award to the Lander Merical Clinic for services rendered to the claimant, should be reversed with instructions to the trial court aforesaid to allow both claims as proper demands upon the Workmen's Compensation Fund of the State of Wyoming.

Reversed with Instructions.

BLUME, C. J., concurred and ILSLEY, J., concurred in the result before his death.