Claim of Verne L. VONDRA, an Employee of Petrotomics.

Minnie A. MITCHELL, Wyoming State Treasurer, ex rel. Workmen's Compensation Department, Appellant (Defendant-Objector below),

Petrotomics, Appellant (Employer-Objector below),

v.

Verne L. VONDRA, Appellee (Employee below).

No. 3731.

Supreme Court of Wyoming.

Dec. 13, 1968.

Joseph E. Darrah, Special Asst. Atty. Gen., Cheyenne, Donald E. Chapin, Casper, for appellants.

John Burk, Casper, for appellee.

Before HARNSBERGER, C. J., and GRAY, McINTYRE, and PARKER, JJ.

Mr. Justice PARKER delivered the opinion of the court.

This is an appeal by the State Treasurer ex rel. Workmen's Compensation Department and the employer from an order of award allowing 41-year-old Verne L. Vondra workmen's compensation because of an injury sustained while the employee was working in a covered occupation, the order of award reciting that the injury was a "Myocardial infarction suffered while moving a piece of sheet steel from outside rack into the shop." Appellants challenge the order on the ground that the court erred (1) in determining that the employee had sustained the burden of proof necessary to establish a claim for workmen's compensation, (2) in adopting the "usual exertion" rule as applicable to an employee who has sustained a myocardial infarction caused by heart disease.

The facts are uncomplicated although there is some conflict, both direct and implied, in the evidence. It is undisputed that Vondra was employed as a mechanic by Petrotomics, went to the job on the morning of January 21, 1968, at about 6:30 a. m., had breakfast there, and began work at about 7 a. m. About 8 a. m. or shortly thereafter, he suffered chest pains; was helped by the foreman to a nearby motel; was later that morning taken to town to the hospital; was examined by a Dr. Gooder and later by Dr. T. L. Holman, an electrocardiogram was taken, which showed a myocardial infarct, that is, an occlusion of the blood vessels of the muscles to one area of the heart; and was later treated by the doctor, the extent of his injury not here being in question. According to Dr. Holman's "Personal History" report to the hospital, made on the date of the examination, "The patient stated that he awakened this morning, felt fine and ate some breakfast and shortly after breakfast he developed a rather severe pain in the chest and this has gotten progressive-

ly worse." Notwithstanding this statement by the doctor, which fails to mention any lifting or dragging of a heavy weight, the claimant according to Dr. Holman two or three days after the admission told the doctor that he had dragged a heavy piece of metal into the shop and had lifted it whereupon the pain in the chest began, and it was upon this statement of history on which Dr. Holman based his testimony concerning the relationship of the infarct to the occupation. The trial court raised a question concerning the "Personal History" report's suggesting that the pain started shortly after breakfast and queried Dr. Holman regarding the source of his information. The doctor responded that in essence the report reflected what Vondra had stated and that the words "while working" did not come until some days later but on further examination said Dr. Gooder had first seen Vondra, that Dr. Phibbs had done the electrocardiogram and told him of the severe heart attack, and that he didn't ask Vondra much that morning about what happened, that the report reflected what Dr. Gooder had told him. Dr. Gooder was not a witness at the trial.

As to claimant's activity on the morning of the 21st, he testified that as a part of his mechanic's duties he was to make manhole lids and an access slot for a manhole, that he went to get metal to make these covers from a rack approximately 150 to 200 feet east of the shop, that he dragged it into the shop, didn't know exactly how heavy it was, but "would say approximately up to one hundred pounds or better," that he then placed it up on some sawhorses to get some pieces out of it for the slot down the side of the manhole and had just accomplished getting it up when he had a terrific pain in his chest. Later he increased the weight of the metal by saying in response to the

court's question, "Well, it is an estimate. I would say in excess of 125 pounds."

On cross-examination claimant conceded that in his occupation he had been called upon at various times to handle hammers weighing around forty-five pounds and to move ball mill liners that would weigh two hundred pounds or better. As to the weight of the metal claimant had handled the morning of the 21st, his foreman, Ronald Beattie, testified that the piece which Vondra had dragged from the scrap pile before he found Vondra, around 8 a. m., in the welding shop, sitting and looking pale, was an irregular piece of metal which had been cut before, approximately 4 feet by 8 inches by ½ inch thick and that it would weigh probably 45, maybe 50, pounds, that he had not weighed it but took the weight from the steel company's catalog.[1]

The testimony of the doctors concerning the cause of the injury and its relationship to the occupation although less than definitive is conflicting, as appears from the following testimony:

"Q. [Dr. Holman] Based upon your examination and history obtained do you have an opinion, based upon reasonable medical certainty, as to the relationship, if any, between the work Mr. Vondra was doing at the time he suffered this pain and his subsequent condition? A. At the time his heart attack occurred, he was doing strenuous work, according to what he told me.

"Q. Do you have an opinion as to whether that has any relationship to the attack as such? A. Yes, it has been proven medically that strain or stress will bring on a condition whereby the plaque or hardening of the part of the wall of the artery may be occluded, the plaque may be flipped off due to stress, the holding of the breath and strain of lifting and so forth.

---

1. Although not in evidence, we take judicial notice that standard steel company publications available to all metal workers show metal 1 foot by 1 foot, 1 inch thick, to weigh 40.8 pounds, and on this basis had the metal been exactly 4 feet long, 8 inches wide, and ½ inch thick, it would have weighed 54.4 pounds.

"Q. Did you find any evidence of prior heart problems? A. No, sir, not in the history at all, no, and not according to the heart tracings.

* * * * * *

"Q. * * * it is your opinion that strenuous activities in this case aggravated a pre-existing heart condition? A. I would say precipitated it.

* * * * * *

"Q. It would seem to me the heart itself that failed rather than the strain being the causative factor, the strain has remained constant throughout this entire period, let's assume. A. No, it hasn't.

"Q. What suddenly make [sic] the flaking occur? A. Unknown factors, nobody knows.

"Q. Except in Mr. Vondra's case there was a cause for the flaking to appear, which would be the increase in the intrathoracic pressure while straining or lifting?

"THE COURT: Are you saying Doctor, it is a medical fact medically accepted that flaking may be attributed to effort?

"THE WITNESS: That is right, stress or effort.

"Q. As well as other causes? A. As well as other causes.

"Q. Doctor, did you have occasion to eliminate all other factors which might produce a similar condition? A. Yes, we did."

Dr. Phibbs testified:

"Q. In evaluating your findings did you arrive at a cause of myocardial infarct, the ultimate cause? A. The ultimate cause is formation of a fatty flake called an atheroma in the wall of an artery, this is a natural process. It is a disease.

* * * * * *

"THE COURT: * * * plainly given this diseased condition, can an exertion bring on the dislodging of the plaque?

"THE WITNESS: No, does not cause it to dislodge at all."

"Q. Is there any reason for exertion at one time precipitating the infarct and in another time not precipitating the same amount of stress? A. You mean granted the same pre-existing disease?

"Q. Right. A. Oh, that is a hard question to answer honestly medically. Let me put it this way, given a diseased coronary artery or coronary arteries it is common to see more than one artery involved in this, more than one branch, once this has happened the blood flow to some area of heart muscle will be cut down so that some part of the heart muscle will receive perhaps half the blood flow that the rest of the heart receives, maybe a quarter, maybe less. This may still be enough blood to supply the heart's need when it is beating at the rate of 60 or 70 or 80 beats a minute, which is the case of most people in the courtroom at the moment when you are sitting quietly. If the heart rate has to exceed let's say 120 or 130, then there would not be enough blood flowing through the narrowed arteries to provide the extra nourishment needed for that extra work and a so-called heart attack would follow."

The case turns on a determination of whether or not under the state of the record the employee met the burden of proof necessary to substantiate a claim under the Workmen's Compensation Law by substantial evidence to show a causal connection between the injury and the employment.

Prerequisite to a reasonable determination of the relationship between heart or circulatory injuries and causation by employment is a recognition of over-all heart problems, their almost universal presence in the body of the modern human at some stage in his life and the difficulties of the medical profession in ascertaining with certainty either the prime or the concurring incitation of a particular attack. The complexity of cardiac problems in the workmen's compensation field is staggering, particularly because an important degree of atherosclerosis of the coronary arteries

is present in approximately 50 percent of all American males over the age of forty-five.[2] It is also reliably stated that one out of every two workmen may come to the end of his working days or the end of his life because of heart disease.[3] This over-all situation with its ramifications was undoubtedly a factor in the Report of the (American Heart Association) Committee (chairmaned by Dr. Paul D. White) on the Effect of Strain and Trauma on the Heart and Great Vessels, the legal subcommittee of which made the following recommendation, "In view of the multitude of factors influencing the constantly changing physical status of a cardiac patient, especially a *sufferer from coronary disease*, it is recommended that an unusual strain for the given individual be the only acceptable injury recognized as aggravating, or revealing, underlying cardiac disease." [4] The full committee included in its recommendation that "further consideration be given to the possibility of removing heart disease from the provisions of Workmen's Compensation Acts and handling it under various insurance coverages." [5]

It is somewhat disturbing to note that although this subcommittee, giving particular and detailed attention to the problem, urged that only *unusual* strain be considered as aggravating, or revealing, underlying cardiac disease a majority of courts have seen fit to accept the "usual exertion" rule in heart cases.[6] These disparate views are difficult of reconciliation although Dr. Larson's comments, 65 Mich.L.Rev. 441, 467–468, shed some light on the matter:

"Holmes' statement that the life of the law has been not logic but experience is probably truer in compensation law than in any other field. Although most of the law built up around the 'accident' requirement, for example, has been based on false premises and embroidered with irrelevant distinctions, there has been a utilitarian purpose behind it all which cannot be disregarded when all of the logical criticisms have been exhausted. That practical consideration is the fear that heart and related cases will get out of control, and will become compensable whenever they take place within the time and space limits of employment, unless some kind of arbitrary boundaries are set. Most states have chosen to press the 'accident' concept into service as one of these arbitrary boundaries, but, with a few exceptions, one gets the impression that what is behind it all is not so much an insistence on accidental quality for its own sake as the provision of an added assurance that compensation will not be awarded for deaths not really caused in any substantial degree by the employment.

"Unfortunately, the unusual-exertion requirement is a clumsy and ill-fitting device with which to ensure causal connection although it undoubtedly does frequently rule out cases in which work-connection is questionable. The fallacy of testing work-connection by a comparison of a man's particular fatal exertion with his usual exertion is that, in many occupations, even the usual exertion is clearly capable of causing the heart collapse. Conversely, in many occupations the usual exertion requires so little effort that, even when it is exceeded, it is medically improbable that the 'unusual' exertion could cause heart failure. It is not as though continuous heavy work over a long period produced a strong heart

---

2. Report of the Committee on the Effect of Strain and Trauma on the Heart and Great Vessels, 26 Circulation 612, 617 (1962).

3. McNiece, Heart Disease and the Law, 112 (1961).

4. Report of the Committee on the Effect of Strain and Trauma on the Heart and Great Vessels, 26 Circulation 612, 620 (1962).

5. Ibid., p. 621.

6. 1A Larson, Workmen's Compensation Law, § 38.30, p. 541 (1967).

while desk work for the same period resulted in a weak heart. The longshoreman and the salesman may have hearts which, weakened by disease, are no different in their ability to withstand strain. In Philadelphia Dairy Products Company v. Farran [5 Terry 380, 44 Del. 380, 57 A.2d 88 (affirmed 5 Terry 437, 44 Del. 437, 61 A.2d 400)], a salesman indulged in the (for him) unusual effort of carrying a fifteen-pound parcel, while the claimant in Marlowe v. Huron Mountain Club [271 Mich. 107, 260 N.W. 130] lifted 200-pound sacks of mail, which for him was routine. Farran got compensation, Marlowe did not. The point is that, as a matter of medical causation, the only question is the ability of the particular strain to affect the particular diseased heart; the character of the claimant's previous exertions is of much less relevance to this issue than is the medical question whether, given this heart and this exertion, the exertion in fact contributed to the collapse. One would assume that a causal connection could more readily be shown when the object lifted was 200 pounds than when it was fifteen."

Whether the legislature of a state in passing workmen's compensation laws intends to embody a health insurance factor, which seems unavoidable under the "usual" exertion rule seems to have been a matter of puzzlement to courts in various jurisdictions and to have had a bearing on holdings that are often tenuous with finespun distinctions. In any event, there can be little doubt that the difficulties encountered by courts in their effort to determine whether an accident has been the cause of a worker's heart attack has been responsible for the rule that mere assertion of a reasonably probable contributory work connection with a heart attack by a medical witness cannot justify a compensation award and instead the facts in their totality must demonstrate causality by the greater weight of credible evidence. Perhaps the leading and most articulate case on the subject is Dwyer v. Ford Motor Company, 36 N.J. 487, 178 A.2d 161, 164–165, where the court in discussing a compensation claim brought by reason of a worker's heart attack said:

"Naturally, the onus of establishing connection between a heart attack death and the work effort rests on the compensation claimant. The burden has been described in various ways but may be stated concisely * * *: Such claimant has the burden of showing by the preponderance of the believable evidence that the ordinary work effort or strain in reasonable probability contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease * * *. In this context, the significance of 'some material degree' cannot be stated with mathematical precision. It means an appreciable degree; a degree greater than *de minimis;* it means that there was some employment exertion capable medically of helping the attack—of furthering its progress. We appreciate the difficulty in formulating a precise legal rule. There has been much discussion and agitation by cardiologists for and against the adoption of minimum medical criteria for use by the expert witness in assessing the probability of causal connection between work effort and heart attacks. But no such uniformly accepted standards have been approved. * * *

"The rule outlined above is not just a catch phrase; it is not simply a formula to be mouthed in making an affirmative assertion of causal connection. The legal conclusion of cause and effect is ordinarily dependent upon evidence of medical causation advanced by physician witnesses in the form of opinion based upon the facts and circumstances attending the heart attack. But we repeat that the *mere* assertion of reasonably probable contributory work connection by a medical witness cannot justify an award. The facts of the situation under examination in their totality must demonstrate causality by the greater weight of the credible evidence. In this area the reasons for

the assertion are more important than the assertion itself. * * * Explanation of the physiological reactions of the diseased or ailing heart to the work strain in terms of sole or contributory cause and effect must generally be regarded as indispensable. The facts and circumstances surrounding the work effort and the heart attack, the medical opinion as to connection between the two, and the explanation of the connection from a medical viewpoint must coalesce in support of a finding by the greater weight of the evidence that the effect was at least contributorily responsible in some material way for the attack."

It is to be observed that in New Jersey the court was dealing with a statute relating to "accident" whereas the basic coverage clause in Wyoming does not contain the accidental factor.[7] Nevertheless this court, perhaps by reason of the use of the word "accident" in various of the workmen's compensation statutes has read "accidental" into the coverage clause.[8]

A correlative rule to that enunciated in the Dwyer case also meriting attention states there is a presumption that injury or death from heart disease is a result of natural physiological causes. Swan v. Williamson, 74 Idaho 32, 257 P.2d 552, 555; Seiken v. Todd Dry Dock, Inc., 2 N.J. 469, 67 A.2d 131, 133.

■ In view of the matters discussed herein, we think that under any reasonable view the burden of the trial court in determining the causal relationship between a heart injury of a workman and his employment is most difficult. Certainly he cannot be satisfied in discharging this upon less than the preponderance of believable evidence that the work effort contributed in a material degree to the precipitation, aggravation, or acceleration of the existing disease.

■ In the instant case in our view the testimony as revealed by the cold record is unconvincing and the evidence is minimal. It is true that Dr. Holman gave his opinion that Vondra's activities precipitated a pre-existing heart condition. This opinion seemed to be based upon what he said had been proven medically and was most general in its nature. Nevertheless, the weighing of the expert testimony is a function of the trier of fact,[9] and is, therefore, outside the ambit of judicial review. Accordingly, if, as we are thus obligated, we give the testimony its full weight without inquiring into facets which we think might well have been emphasized, we find insufficient reason to disturb the order entered.

The problem is properly one for the legislature, which could clarify the present nebulous status of causal relation of employment to heart injuries in workmen's compensation and thereby indicate its intention as to extent of coverage.

Affirmed.

7. 1A Larson, Workmen's Compensation Law § 37.10, pp. 511–512 (1967).

8. Wright v. Wyoming State Training School, 71 Wyo. 173, 255 P.2d 211; In re Scrogham, 52 Wyo. 232, 73 P.2d 300; Pero v. Collier-Latimer, Inc., 49 Wyo. 131, 52 P.2d 690.

9. Bocek v. City of Sheridan, Wyo., 432 P.2d 893, 895; White v. Maverick Production Co., 63 Wyo. 452, 182 P.2d 818; Miracle v. Barker, 59 Wyo. 92, 136 P. 2d 678, 684.